## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| Plaintiff, : | Civil Action No. |
| v. : | |
| : | |
| VIOSOLAR, INC., : | |
| RICHARD W. WALCHUK, : | |
| CAROLINE WINSOR, : | |
| LISA A. ESPOSITO and : | |
| LANCE W. BAUERLEIN, : | |
| : | |
| Defendants. : | |

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission") alleges as follows:

## SUMMARY

1.      This matter involves the market manipulation of the common stock of two micro-cap companies – Viosolar, Inc. ("Viosolar") and FACT Corporation.

2.      From at least July 2008 through October 2008, Viosolar, its President and Chief Executive Officer, Richard W. Walchuk, and Caroline Winsor, a Canadian-based stock promoter, aided and abetted by Lisa A. Esposito, a then-registered representative of a brokerage firm, engaged in a fraudulent scheme to manipulate the market of Viosolar's and FACT Corporation's common stock.  Lance W. Bauerlein, an investor relations agent for FACT Corporation, aided and abetted the manipulation of FACT Corporation.

3.      Specifically, Winsor and Walchuk paid kickbacks to a Consultant (the "Consultant"), an individual whom they believed had connections to corrupt registered representatives, in exchange for generating or causing purchases of Viosolar and FACT Corporation

common stock.  In reality, the Consultant was, at all times, cooperating with the United States government (the "Government").

4.      In furtherance of this scheme, Winsor and Walchuk, aided and abetted by Esposito, paid at least $1,000 to the Consultant in exchange for completed purchases of at least 5,000 shares of Viosolar common stock, and aided and abetted by Esposito and Bauerlein, paid at least $1,000 to the Consultant in exchange for completed purchases of at least 12,500 shares of FACT Corporation common stock.  Defendants made these payments to generate stock purchases and to create the appearance of market interest, induce public purchases of the stocks, and ultimately increase the stocks' trading price.

## VIOLATIONS

5.      As a result of the conduct described in this Complaint, Defendants Viosolar, Winsor and Walchuk violated, and unless restrained and enjoined by the Court will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

6.      As a result of the conduct described in this Complaint, Defendants Esposito and Bauerlein aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder, and unless restrained and enjoined by the Court will continue to violate these provisions of the federal securities laws.

## JURISDICTION AND VENUE

7.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], seeking permanently to enjoin Defendants from engaging in the acts, practices and courses of business alleged in this Complaint.

8.      The Commission seeks a final judgment ordering Viosolar, Walchuk, Winsor, Esposito and Bauerlein to disgorge their ill-gotten gains, together with prejudgment interest thereon.

9.      The Commission seeks a final judgment ordering Viosolar, Walchuk, Winsor, Esposito and Bauerlein to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

10.     The Commission seeks penny stock bars pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)] against Walchuk, Winsor, Esposito and Bauerlein.

11.     The Commission seeks a final judgment barring Walchuk from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

12.     This Court has jurisdiction over this action pursuant to Sections 21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa].

13.     Venue in this District is proper pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa], because certain of the acts or transactions constituting the violations alleged herein occurred within the Eastern District of Pennsylvania. For example, the Consultant was present within the Eastern District of Pennsylvania for some, if not all of the telephone calls described below, and Defendants wired kickback payments to a bank account within the Eastern District of Pennsylvania as part of the scheme. For all communications in which they engaged in the scheme described herein, Winsor and Walchuk were located outside of the United States.

14.     Defendants, directly or indirectly, have made use of the means and instruments of interstate commerce, or of the mails, or of the facilities of a national securities exchange, in connection with the acts, practices and courses of business alleged in this Complaint.

3

## DEFENDANTS

15.     **Viosolar, Inc.** is a Canadian corporation with its principal place of business in Athens, Greece.

16.     **Caroline Winsor**, age 66, a citizen of Canada, has a residence in Calgary, in the province of Alberta, Canada, but her current whereabouts are unknown.  During the relevant time period, Winsor was the managing partner of International Securities Group Inc. ("ISG"), a Canadian corporation that purportedly provides administrative support services and handles regulatory filings for various Over-the-Counter Bulletin Board ("OTCBB") and Pink Sheet-listed companies.  Neither Winsor nor ISG are registered with the Commission in any capacity.

17.     **Richard W. Walchuk**, age 57, is a Canadian citizen and is believed to reside in Athens, Greece.  During the relevant time period, Walchuk was the President, Chief Executive Officer and a director of Viosolar, Inc.  Walchuk is also the President, Secretary, Treasurer and Director of American Graphite Technologies, Inc., a U.S. corporation purportedly engaged in mineral exploration and technology development, and whose shares are traded on the OTCBB.

18.     **Lisa A. Esposito**, age 48, resides in Palm City, Florida.  Between May 1993 and 2009, Esposito was a registered representative associated with several different brokerage firms that were members of the Financial Industry Regulatory Authority ("FINRA"), formerly referred to as the National Association of Securities Dealers ("NASD").  At the time of the conduct alleged in this Complaint, Esposito was a registered representative associated with Meeting Street Brokerage, LLC.  In 2008, FINRA charged Esposito with, among other things, violations of Section 10(b) of the Exchange Act, and Rule 10b-5 thereunder in connection with her participation in a scheme to manipulate the securities of a Pink Sheet-traded stock through matched orders and wash sales.  On December 8, 2009, Esposito entered into a settlement with FINRA, consenting to a permanent bar

from association with any FINRA member. In 2001, the Commission censured Esposito pursuant to Section 15(b) of the Exchange Act; ordered her to cease and desist from causing violations of Regulation T, Section 7(c) of the Exchange Act and Exchange Act Rule 10b-16; ordered her to pay a civil penalty of $10,000; and suspended her from association with any broker or dealer for a period of three months.

19.     **Lance W. Bauerlein**, age 65, resides in Lisle, Illinois. At all times relevant to the facts alleged in this Complaint, Bauerlein was an investor relations agent for FACT Corporation. Bauerlein has not been registered with the Commission in any capacity since 1985, when the NASD barred him from association with any member of the NASD in any capacity, fined him $90,000, and ordered him to disgorge $280,000 based on a NASD complaint alleging Bauerlein engaged in private securities transactions at unfair prices.

## FACTS

### Background

20.     At all times relevant to the facts alleged in this Compliant, Defendant Viosolar acted by and through Defendant Walchuk.

21.     Viosolar is purportedly an alternative energy company engaged in the business of construction management and operation of solar parks in Greece and other South and South Eastern European Union countries. At all times relevant to the Complaint, Viosolar's common stock was dually quoted on the OTCBB and the OTC Link (formerly referred to as the "Pink Sheets") under the symbol "VIOSF." Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act.

22.     FACT Corporation is a Colorado corporation with its principal place of business in Belleville, New Jersey. FACT Corporation is purportedly engaged in developing, licensing, and

supplying functional bake mixes to manufacturers of bakery and pasta products. At all times relevant to the Complaint, Defendant Winsor's daughter, Jacqueline R. Danforth, was the president and CEO of FACT Corporation. ISG, a Canadian-based company controlled by Winsor that purportedly provided consulting services to companies quoted on the OTCBB and Pink Sheets, was FACT Corporation's largest shareholder. FACT Corporation's common stock was quoted on the OTC Link under the symbol "FCTOA." Its common stock is registered with the Commission pursuant to Section 12(g) of the Exchange Act.

23.     During the time period relevant to the Complaint, Viosolar and FACT Corporation qualified as penny stocks as defined by Rule 3a51-1 of the Exchange Act, and did not meet any exceptions to that rule.

**The Manipulative Schemes**

24.     Beginning at least as early as July 2008, Defendants orchestrated and directed a scheme to manipulate the markets for FACT Corporation and/or Viosolar stock. They did this in various ways, including: a) entering into illegal agreements to orchestrate trading activity to create the false impression of increased market demand for FACT Corporation and Viosolar stock; b) engaging in, directing, or causing manipulative and deceptive securities transactions to artificially increase the price and trading volume of FACT Corporation's and Viosolar's stock; and c) coordinating the fraudulent trading activity with the issuance of FACT Corporation and Viosolar press releases to provide a false pretext for the increased trading volume in the companies' stocks and to induce public investors to also make purchases of FACT Corporation and Viosolar stock.

25.     Between July 2008 and October 2008, Defendants Winsor, Walchuk, Esposito and Bauerlein engaged in several telephone conversations with the Consultant in which they described their intent and confirmed their involvement in the manipulation of Viosolar's and/or FACT

Corporation's common stock through the payment of illegal kickbacks in exchange for the purchase of shares on the open market.

26.      Through these activities, Defendants created artificial trading activity, injected artificial information into the marketplace, and created a false impression of supply and demand for FACT Corporation's and/or Viosolar's stock.

27.      Specifically, on or about July 17, 2008, the Consultant contacted Esposito, a corrupt registered representative whom he had known from past manipulation schemes, and asked her if she knew of any companies in need of a "buying campaign." The Consultant told Esposito that he could arrange for the manipulation of stocks through his nationwide network of corrupt brokers who could purchase and hold stock for an extended period of time in exchange for a 20 percent fee. Esposito expressed interest in the Consultant's offer and, on or about July 22, 2008, Esposito introduced the Consultant to Winsor, for the purpose of orchestrating illegal buying programs. Winsor was the managing partner of ISG, a Canadian-based company that purportedly provided consulting services to companies quoted on the OTC Bulletin Board and Pink Sheets.

28.      On or about July 22, 2008, the Consultant and Winsor had a conversation in which the Consultant described the details of his illegal buying program and how his network could generate $500,000 to $1 million of monthly buying and would hold the stock for years. As a part of the buying program, the Consultant told Winsor he required a test trade whereby his brokers would purchase a small amount of stock in exchange for a 20 percent kickback payment.

29.      On or about August 12, 2008, Esposito called the Consultant and identified two companies for the buying program: FACT Corporation and Viosolar. In furtherance of the scheme, Esposito touted the fact that Winsor's daughter was FACT Corporation's President and CEO and

7

claimed that the deals would be highly profitable for everyone because the stock ownership of these companies was "very tight," which gave Winsor "full control" of the trading in the stock.

30.     On or about August 19, 2008, the Consultant, Winsor and Esposito discussed the scheme to manipulate the markets for FACT Corporation and Viosolar stock. During the same call, Winsor told the Consultant that she would provide a Non-Objecting Beneficial Owner's List ("NOBO List") to the Consultant. A non-objecting beneficial owner means a person with beneficial ownership in a security who gives permission to a financial intermediary (usually broker-dealer or bank) to release his name and address to the issuer of the security. NOBO Lists disclose to the issuer the names of the beneficial owners who are not otherwise known to the issuer because these investors are not directly registered on the issuer's records.

31.     During a subsequent telephone call on or about August 22, 2008, Winsor provided the Consultant with the contact information for Bauerlein, whom she described as a long-time associate who handled investor relations for FACT Corporation. Winsor told the Consultant that Bauerlein knew FACT Corporation's stock "inside out," and could answer any questions the Consultant had about the NOBO List.

32.     During a telephone call on or about August 29, 2008 (the "August 29, 2008 call"), the Consultant and Winsor and Walchuk discussed the scheme to manipulate the stock of FACT Corporation and Viosolar. Bauerlein participated in the portion of the call in which the manipulation of FACT Corporation was discussed. Esposito also participated in a portion of the August 29, 2008 telephone call. After the Consultant had summarized the details of the illegal scheme, Esposito announced that she was a "licensed broker", "can't be part of this conversation", and for "obvious reasons" was signing-off the conference call.

8

33.     Winsor stated that she wanted to raise $500,000 from the FACT Corporation manipulation, which she estimated would require $1 million to $2 million in buying.  Winsor further stated that she would like to "get the price up" and that she would like a "very slow and steady gain in price."  During the call, Bauerlein advised the Consultant of the desired level of daily buying for the manipulation.  Specifically, Bauerlein confirmed that, based on a previous FACT Corporation mass mailing program, he believed the Consultant could safely increase buying to $500,000 per day within the first couple of days.

34.     During the August 29, 2008 call, the Consultant, Winsor, Walchuk and Bauerlein also discussed the need to issue press releases to provide a false pretext to explain the higher than normal trading volume that would result from the illegal scheme.  Winsor stated that, working with Bauerlein, she could "put together a package of news" and could generate "one or two pieces of news per week" for FACT Corporation.  Walchuk agreed, stating that "if we start putting out news, we should be okay with an increase in volume."

35.     During the August 29, 2008 call, the Consultant, Winsor, and Walchuk also discussed their plans to manipulate the stock of Viosolar.  Walchuk explained to the Consultant that he wanted a $3 million to $4 million buying campaign for the purpose of raising the stock price from $1.10 per share to $2.00 per share.

36.     While still on the telephone, Walchuk emailed Viosolar's Depository Trust Company Reports ("DTC Reports") to the Consultant and explained that $2.2 million in outstanding stock was owned by officers, directors, family members, and clients over whom Walchuk had "decent control."  DTC Reports contain information that reflects ownership positions of the issuer's securities in DTC accounts at the moment in time the report was produced.  DTC does not make the reports publicly available as they are only provided to issuers upon request.

37.     Walchuk also told the Consultant that, beginning in early September, he would be able to provide the Consultant with one or two news releases per week.  The Consultant then confirmed that he would begin the program in a few weeks, starting with the agreed upon test trade.

**Execution of the Test Trades**

38.     Leading up to the execution of the test trades, the Consultant gave Winsor and Bauerlein wire instructions for his 20 percent fee and also confirmed that Winsor and Walchuk intended to coordinate the issuance of press releases in FACT Corporation and Viosolar with his test buys.

39.     During a telephone call on or about September 8, 2008, Esposito told the Consultant that she would accept 4 percent of the 20 percent kickback payment as her referral fee for the FACT Corporation and Viosolar manipulations.

40.     As promised, on or about October 8, 2008, Winsor emailed the Consultant a NOBO List detailing shareholder positions in FACT Corporation.

41.     On or about October 14, 2008, Bauerlein emailed the Consultant and Winsor a nonpublic draft news release for FACT Corporation.  On the same date, Winsor emailed the Consultant the nonpublic final news releases for FACT Corporation and Viosolar indicating they would be released to the public and published the next morning.  The FACT Corporation news release, entitled "FACT Corporation CEO Provides Retrospective Overview and Comments on Future Direction," was a generic review of the company's past performance and referenced a plan to enter a new market category, with new product offerings.  The Viosolar release generally claimed that the company was in the early stages of negotiations to purchase the rights to license applications for the generation of energy through solar technology.  As Defendants had discussed during the telephone calls, Defendants intended the press releases to provide a false pretext that

would provide the market with a plausible explanation for the increase in trading that was caused by the kickback scheme.

42.     On the morning of October 15, 2008, both Winsor and Walchuk published the press releases that they had forwarded to the Consultant a day earlier.  That same day, in accordance with the prearranged agreement between the Defendants and the Consultant, 12,500 shares of FACT Corporation stock were purchased at $.40 per share for approximately $5,000, which represented 56 percent of that day's trading volume of 22,500 shares.  In addition, 5,000 shares of Viosolar  stock were purchased at $1.00 per share, for approximately $5,000, which represented 42 percent of that day's trading volume of 12,000 shares.  In reality, all of these purchases were made by the Government.

43.     On October 15, 2008, following the Government's prearranged purchases of FACT Corporation's and Viosolar's stock, the Consultant emailed Winsor and Bauerlein and advised them that the FACT Corporation and Viosolar trades had been successfully executed.  Winsor responded to the Consultant's email stating "I will send the consulting fee out as previously advised."

44.     Later the same day, Winsor, through her company ISG, wired $2,000 from an ISG account held at an Alberta, Canada based bank to a bank account in Philadelphia, PA controlled by the Government.  The $2,000 wire represented the 20 percent payment for the combined $10,000 purchase of FACT Corporation and Viosolar common stock.

45.     On or about October 17, 2008, the Consultant contacted Esposito to confirm the successful test trade and they discussed her referral fee.  Esposito expressed concern that FINRA occasionally checked her bank statements, and suggested that the Consultant not directly send her any funds.  She stated that Winsor already paid her for other work she performed on her behalf.

## FIRST CLAIM FOR RELIEF

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by Viosolar, Walchuk and Winsor

46.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 45, inclusive, as if the same were fully set forth herein.

47.     From at least July 2008 through October 2008, Defendants Viosolar, Walchuk and Winsor knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of a national securities exchange:

(a)     employed devices, schemes or artifices to defraud;

(b)     made untrue statements of material fact, or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c)     engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security.

48.     By engaging in the foregoing conduct, Defendants Viosolar, Walchuk and Winsor violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5], thereunder.

## SECOND CLAIM FOR RELIEF

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by Esposito and Bauerlein

49.     The Commission realleges and incorporates by reference each and every allegation in paragraphs 1 through 48, inclusive, as if the same were fully set forth herein.

50.     By engaging in the foregoing conduct, Defendants Esposito and Bauerlein knowingly provided substantial assistance to Viosolar, Walchuk and Winsor in their violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5], thereunder, and thereby aided and abetted, and unless restrained and enjoined will continue to aid and abet, violations of these provisions of the federal securities laws.

**WHEREFORE**, the Commission respectfully requests that this Court enter a final judgment:

### I.

Permanently restraining and enjoining Defendants Viosolar, Inc., Richard W. Walchuk, Caroline Winsor, Lisa A. Esposito, and Lance W. Bauerlein from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R.§ 240.10b-5] thereunder.

### II.

Ordering Viosolar, Walchuk, Winsor, Esposito and Bauerlein to disgorge any and all ill-gotten gains, together with prejudgment interest, derived from the activities set forth in this Complaint.

### III.

Ordering Viosolar, Walchuk, Winsor, Esposito and Bauerlein to pay civil money penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C.§ 78u(d)(3)].

**IV.**

Prohibiting Walchuk, pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)].

**V.**

Prohibiting Walchuk, Winsor, Esposito and Bauerlein from participating in any offering of penny stock pursuant to Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

**VI.**

Granting such other and further relief as the Court may deem just and appropriate.

Respectfully submitted,

*Scott A Thompson*
_____
Daniel M. Hawke
Brendan P. McGlynn (77271)
Scott A. Thompson (90779)
Lisa M. Candera (93753)

Attorneys for Plaintiff:

**SECURITIES AND EXCHANGE COMMISSION**
Philadelphia Regional Office
701 Market Street, Suite 2000
Philadelphia, PA  19106
Telephone: (215) 597-3100
Facsimile: (215) 597-2740

Dated:  September 27, 2013

14